## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:25-cv-01483

ZANE WHITFIELD, Derivatively on Behalf
of MODIVCARE, INC.,

       Plaintiff,

       v.                                   JURY TRIAL DEMANDED

L. HEATH SAMPSON, KENNETH SHEPARD,
BARBARA K. GUTIERREZ, LESLIE V.
NORWALK, TODD J. CARTER, DAVID A.
COULTER, GARTH GRAHAM, RAHUL
SAMANT, RICHARD A. KERLEY,
CHRISTOPHER S. SHACKELTON,
STACY SAAL, and FRANK J. WRIGHT,

       Defendants,

       - and -

MODIVCARE, INC.,

       Nominal Defendant.

---

### VERIFIED SHAREHOLDER DERIVATIVE COPMLAINT

    Plaintiff Zane Whitfield ("Plaintiff"), by and through his undersigned attorneys, brings this verified stockholder derivative action on behalf of nominal defendant ModivCare, Inc. ("ModivCare" or the "Company"), against certain of the Company's executive officers and its board of directors (the "Board") for breaches of fiduciary duties and violations of federal law by the Individual Defendants (defined below). Plaintiff's allegations are based on personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based on, *inter alia*, the investigation conducted by his counsel, including review of publicly available information regarding the Company; the allegations of a class action complaint filed in

the Securities Class Action captioned *Kalera v. ModivCare, Inc., et al.,* Case No. 1:25-cv-00306-GPG-KAS (D. Colo.); (the "Securities Class Action"); conference call transcripts and announcements; filings with the United States Securities and Exchange Commission (the "SEC"); press releases disseminated by ModivCare; legal filings; news reports; and securities analysts' reports about the Company.

## NATURE OF THE ACTION

1.      This shareholder derivative action is brought by Plaintiff on behalf of ModivCare against certain officers and members of the Company's Board (the "Individual Defendants")[1] for breaches of their fiduciary duties between at least November 3, 2022 and September 15, 2024, inclusive (the "Relevant Period"), and for violations of the federal securities laws, as set forth below.

2.      ModivCare is a technology-enabled healthcare services company that provides a suite of integrated supportive care solutions for public and private payors and their members.

3.      The Company's three business segments are: (i) non-emergent medical transportation ("NEMT"); (ii) personal care services ("PCS"); and (iii) and in-home monitoring solutions.

4.      The Company's NEMT segment's operating model includes the coordination of non-emergency medical transportation services supported by an infrastructure of core competencies in risk underwriting, contact center management, network credentialing, and claims management.

---

[1] The Individual Defendants are L. Heath Sampson ("Sampson"), Kenneth Shepard ("Shephard"), Barbara K. Gutierrez ("Gutierrez"), Leslie V. Norwalk ("Norwalk"), Todd J. Carter ("Carter"), David A. Coulter ("Coulter"), Garth Graham ("Graham"), Rahul Samant ("Samant"), Richard A. Kerley ("Kerley"), Christopher S. Shackelton ("Shackelton"), Stacy Saal ("Saal"), and Frank J. Wright ("Wright"). "Defendants" means ModivCare and the Individual Defendants.

5.      Throughout the Relevant Period, the Individual Defendants touted certain of the Company's contracts used in its NEMT segment, highlighting these contracts as mitigating risks to the Company's free cash flow. However, in reality, ModivCare's free cash flow was rapidly deteriorating.

6.      The truth began to emerge on May 4, 2023, when the Company hosted an earnings call for investors and analysts to discuss its financial results for the first quarter of 2023 (the "1Q23 Earnings Call"). During the 1Q23 Earnings Call, Defendant Shepard revealed that the Company experienced a reduction in cash flow from operations during the first quarter, stating, in relevant part:

> Consolidated cash-flow from operations in the first quarter of 2023 was the use of approximately $3 million due to a $7 million reduction in contract payables and $31 million increase in contract receivables. Excluding these items, our cash flow from operation would have been better in the first quarter by $38 million.

7.      On this news, the Company's stock price declined $11.30 per share, or approximately 16%, to close at $58.00 per share on May 4, 2023.

8.      Then, on August 3, 2023, the Company hosted an earnings call for investors and analysts to discuss its financial results for the second quarter of 2023 (the "2Q23 Earnings Call"). During the 2Q23 Earnings Call, Defendant Sampson revealed that the Company's cash flow from operations during the quarter was impacted due to a "large payable balance," stating, in relevant part:

> I'd like to address our second quarter cash flow from operations, which was negative $108 million, mainly due to a $96 million decrease in our net contract payables, less receivable balance during the quarter, along with a onetime $9.6 million arbitration settlement with a former employee. Post the pandemic, coupled with a shift to more shared risk NEMT contracts, we experienced a temporary timing mismatch between payments and collections, which created a large payable balance that we've been reducing over the past year.

9.      On this news, ModivCare's stock price declined $2.86 per share, or approximately

7%, to close at $35.58 per share on August 4, 2023.

10.    On February 23, 2024, the Company hosted an earnings call for investors and analysts to discuss its financial results for the fourth quarter of 2023 (the "4Q23 Earnings Call"). During the 4Q23 Earnings Call, Defendant Sampson revealed that the Company suffered negative cash flow during the fourth quarter and that the Company expected this trend to continue into the first half of 2024, stating, in relevant part:

> Firstly, our free cash flow for the fourth quarter was negative $37 million, which was below expectations, primarily due to delay in payment from an MCO client within a specific contract in Florida. Looking ahead, and primarily to us managing redetermination and the increased healthcare utilization environment, we anticipate our free cash flow for the first half of the year will be constrained to the ongoing build in contract receivables and the settlement of several large payables expected in the second quarter.

11.    On this news, the Company's stock price declined $17.25 per share, or approximately 39%, to close at $26.62 per share on February 23, 2024.

12.    Then, on September 12, 2024, the Company filed a Form 8-K with the SEC, wherein ModivCare revealed that the Company was "undertaking actions to seek additional capital, including filing a shelf registration statement" with the SEC to improve its liquidity due, in part, outstanding contract receivables.

13.    On this news, the Company's stock price declined $18.43 per share, or approximately 59%, to close at $12.76 per share on September 12, 2024.

14.    The truth was fully revealed on September 16, 2024, when the Company issued a press release providing a financial update. In this press release, the Company revised its 2024 Adjusted EBITDA guidance range from $185–$195 million to $170–$180 million, "primarily due to NEMT segment pricing accommodations made to strategically retain and expand key customer relationships."

15.     On this news, the Company's stock price declined $1.40 per share, or approximately 10%, to close at $12.72 per share on September 16, 2024.

16.     Throughout the Relevant Period, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and/or misleading statements and omissions of material fact to the investing public.  Specifically, the Individual Defendants failed to disclose to investors, *inter alia*, that: (i) certain of the Company's contracts in its NEMT segment were causing ModivCare's free cash flow to deteriorate; (ii) as a result, the Company's contract renegotiations and pricing accommodations were negatively impacting the Company's adjusted EBITDA; (iii) as a result, the Company had insufficient liquidity; (iv) the Company failed to maintain adequate internal controls and risk oversight over its financial reporting; and (v) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

17.     As a result of the foregoing, the Securities Class Action was filed against the Company and Defendants Sampson, Shephard, and Gutierrez, in the United States District Court for the District of Colorado, exposing the Company to massive class-wide liability and costs related to defending itself in the Securities Class Action.

18.     Furthermore, as detailed herein, as a direct and proximate result of the Individual Defendants' misconduct, the Company repurchased its own stock at artificially inflated prices during the Relevant Period, costing the Company hundreds of thousands of dollars.

19.     Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants'

liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of ModivCare's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder by the SEC, Section 10(b) of the Exchange Act (15 U.S.C. § 78(j)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder by the SEC, and Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)).

21.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

22.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

23.     In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

24.     Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because ModivCare maintains its principal executive offices in this District,

Defendants have conducted business in this District, a substantial portion of the acts and omissions alleged herein, including the issuance and dissemination of materially false and misleading information, occurred in this District, Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Securities Class Action is pending in this District.

**PARTIES**

*Plaintiff*

25.    Plaintiff is, and has been at all relevant times, a continuous shareholder of ModivCare.

*Nominal Defendant*

26.    Nominal Defendant ModivCare is a Delaware corporation with its principal executive offices located at 6900 E. Layton Avenue, 12th Floor, Denver, Colorado, 80237. ModivCare's common stock trades on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "MODV."

*Individual Defendants*

27.    Defendant Sampson has served as Chief Executive Officer ("CEO"), President, and a director of the Company since July 2022. Sampson previously served as Chief Financial Officer ("CFO") of the Company between February 2021 and September 2023. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Sampson received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2022 | $2,266,785 |
| 2023 | $2,692,762 |
| 2024 | $2,250,122 |

28.    Defendant Shepard has served as CFO of the Company's Mobility business, which

comprises the Company's NEMT segment, since August 2022. Shepard previously served as the Company's Chief Accounting Officer from July 2021 until August 2022.

29.    Defendant Gutierrez has served as CFO of the Company since September 2023. According to the Form 8-K filed by the Company on May 5, 2025, with the SEC, Gutierrez will no longer serve as CFO of the Company effective May 31, 2025. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Gutierrez received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2023 | $954,112 |
| 2024 | $1,365,735 |

30.    Defendant Norwalk has served as a director of the Company since 2015 and as Chairperson of the Board since December 2024. Norwalk also serves as Chairperson of the Company's Nominating and Governance Committee and as a member of the Company's Audit Committee. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Norwalk received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2022 | $249,980 |
| 2023 | $249,955 |
| 2024 | $240,955 |

31.    Defendant Carter has served as a director of the Company since 2016. Carter also serves as a member of the Company's Compensation Committee. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Carter received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2022 | $222,480 |
| 2023 | $222,455 |
| 2024 | $222,455 |

32.     Defendant Coulter served as a director of the Company from 2016 until April 2025. During the Relevant Period, Coulter also served as a member of the Company's Nominating and Corporate Governance Committee. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Coulter received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2022 | $222,480 |
| 2023 | $222,455 |
| 2024 | $222,455 |

33.     Defendant Graham served as a director of the Company from 2021 until February 2025. During the Relevant Period, Graham also served as a member of the Company's Nominating and Governance Committee. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Graham received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2022 | $222,480 |
| 2023 | $222,455 |
| 2024 | $222,455 |

34.     Defendant Samant served as a director of the Company from 2021 until December 2024. During the Relevant Period, Samant also served as a member of the Company's Audit Committee and Compensation Committee. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Samant received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2022 | $229,980 |
| 2023 | $229,955 |
| 2024 | $229,955 |

35.     Defendant Kerley served as a director of the Company from 2010 until April 2025.

During the Relevant Period, Kerley also served as Chairperson of the Company's Compensation Committee and Audit Committee. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Kerley received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2022 | $269,980 |
| 2023 | $269,955 |
| 2024 | $269,955 |

36.     Defendant Shackelton served as Chairman of the Board from 2012 until December 2024. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Shackelton received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2022 | $249,980 |
| 2023 | $249,955 |
| 2024 | $249,955 |

37.     Defendant Saal served as a director of the Company from 2021 until October 2023. During the Relevant Period, Saal also served as a member of the Company's Compensation Committee. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Saal received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2022 | $222,480 |
| 2023 | $199,330 |

38.     Defendant Wright served as a director of the Company from 2016 until June 2024. During the Relevant Period, Wright also served as a member of the Company's Audit Committee and Nominating and Governance Committee. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Wright received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2022 | $237,480 |
| 2023 | $237,465 |
| 2024 | $46,076 |

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

39. Because of their positions as officers and/or directors of ModivCare, and their ability to control the business and corporate affairs of the Company, the Individual Defendants owed ModivCare and its shareholders fiduciary obligations of good faith, loyalty, trust, and candor and were required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner at all relevant times.

40. Therefore, the Individual Defendants were required to act in furtherance of the best interests of ModivCare and its shareholders.

41. Each director and officer of the Company owes to ModivCare and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

42. The Individual Defendants, because of their positions of control and authority as directors and/or officers of ModivCare, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

43. Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of trust, loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of ModivCare, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the

Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

44.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty: to ensure that ModivCare implemented and properly monitored the Company's internal controls over financial reporting; to prevent the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations; and to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

45.    To discharge their duties, the officers and directors of ModivCare were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of ModivCare were required to, among other things:

(a)    Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Colorado and the United States, and pursuant to ModivCare's own Code of Conduct (the "Code of Conduct");

(b)    Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(c)     Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion;

(d)     Remain informed as to how ModivCare conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(e)     Establish and maintain systematic and accurate records and reports of the business and internal affairs of ModivCare and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(f)     Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that ModivCare's operations would comply with all applicable laws and ModivCare's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(g)     Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(h)     Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)     When put on notice of problems with the Company's business practices, operations, or internal controls, exercise good faith in taking appropriate action to correct the

misconduct and prevent its recurrence.

46.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by ModivCare.

47.     At all times relevant hereto, the Individual Defendants were the agents of each other and of ModivCare and were at all times acting within the course and scope of such agency.

48.     Each of the Individual Defendants breached his or her fiduciary duties as alleged herein, both individually and in concert with the other Defendants.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

49.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

50.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

51.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

52.     In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.  Because the actions

14

described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of ModivCare, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

53.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

54.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of ModivCare and at all times acted within the course and scope of such agency.

## MODIVCARE'S CODE OF CONDUCT

55.    ModivCare's Code of Conduct begins with a message from Defendant Heath, which states, in relevant part:

> Embodying our core values each and every day drives our purpose of Making Connections to Care.  By using our values as our guide, together we create our culture, a culmination of our collective efforts to always stand for what is right and ethical, no matter the situation. . . .

> Each ethical decision and action point creates a positive ripple effect within our community of members, colleagues, caregivers, transportation providers and fellow team members. As we continue to evolve as an organization, one thing that doesn't change is our commitment to acting with integrity and transparency.  By doing so you embody the principles outlined in our Code of Conduct to uphold and protect our brand and reputation.

56.    The Code of Conduct applies to all of the Company's "team members" and must be followed by the Company's Board members, vendors, contractors, and subcontractors.

57.     In the "Introduction" section, the Code of Conduct states, in relevant part, that:

The purpose of the COC is to promote and provide guidance to the Company's team members, executives, officers, managers, and business associates on honest, ethical, and legal conduct in all areas of the Company's business, including:

- Complying with various applicable healthcare statutes, regulations, and guidance materials, and any other applicable laws, rules, and regulations

- Ensuring implementation and maintenance of an effective compliance program at Modivcare

- Handling actual or apparent conflicts of interest between personal and professional activities and relationships in an ethical and timely manner

- Making full, fair, accurate, timely, and understandable public communications

- Reporting to the appropriate person(s) identified in this COC of violations of the COC, including ethical rules, principles, and standards, completely and promptly

- Enforcing accountability for failure to adhere to the COC

58.     In a section titled "Effective Compliance Program Components," the Code of Conduct states:

The Company works diligently to have an effective compliance program. This COC is one component of this multi-faceted effort. The Compliance Program, consisting of the seven elements listed below and discussed throughout this COC, reduces the likelihood of instances of unethical and noncompliant behavior, minimizes the consequences should instances of noncompliance occur, and otherwise protects the Company's corporate brand and reputation.

The seven elements of the Company's Compliance Program are:

1. Compliance Officer, Compliance Committee, and high level oversight
2. Written code of conduct, policies, and procedures

3. Effective training and education

4. Effective lines of communication

5. Routine identification, monitoring, and auditing of compliance risks

6.  Enforced standards and discipline

7.  Prompt and effective responses to compliance issues

Each of these seven elements is vital to the success and effectiveness of the Company's Compliance Program. They are discussed in greater detail throughout this COC.

59.    In a section titled "Violations of the COC, Policy, or Law," the Code of Conduct states, in relevant part:

All team members are responsible for complying with the COC, the Company's related compliance policies and procedures, and applicable laws and regulations. Part of that responsibility is to report known or suspected violations of the COC, Company policies and procedures, or applicable law. In addition, supervisors or managers may be held responsible for the behavior of their subordinates and all agents, consultants, and other representatives of the Company under their reasonable control. If a violation occurs, the specific disciplinary action taken will depend on the circumstances but may include suspension or termination of employment or other association with the Company, or legal action, as the Company deems appropriate.

60.    In a section titled "Maintain Accurate Business and Financial Records," the Code of Conduct states, in part:

Everyone must create and maintain accurate business and financial records. Preserving the integrity of our financial records is not only the law, but is also important for accurately measuring and maintaining our competitive success and public credibility. Modivcare's parent company, Modivcare Inc., must file periodic reports with the Securities and Exchange Commission (SEC) that are also available for public review and contain information upon which the public may rely. We take this public disclosure responsibility very seriously, and are committed to ensure that all Company communications are complete and accurate.

Books and records must also be kept in compliance with government procurement and contracting rules, other client contract requirements, and any administrative requirements of the government agencies that oversee or do business with the Company. We maintain records relating to our provision of services under Medicaid, Medicare, and MCO contracts for a period of 10 years from creation.

Business records, including financial documents, expense accounts, reimbursements, and timesheets, must be accurate and complete. Never include false or misleading information in any business record, and do not omit accurate information in an effort to mislead or conceal. Those team members who are

authorized to enter agreements that bind the Company must never execute a contract that does not fully reflect the true nature and economic substance of the transaction or business activity, or omit material facts from an agreement. Only certain Modivcare team members may execute contracts, and then only in accordance with the Company's Schedule of Authorizations, which is found on the Employee Web Portal or may be provided by request to the Chief Compliance Officer or General Counsel, Jonathan Bush, at jonathan.bush@Modivcare.com.

You must never create or maintain any accounts, entities, assets, or funds that are not fully and accurately recorded in the Company's books. You must at all times comply with the Company's internal accounting and auditing policies and controls, which are designed to protect the integrity of our corporate records and the Company's finances. If you are uncertain as to the appropriateness of any accounting or financial reporting matter, you should ask your supervisor. Further, no team member may fraudulently influence, coerce, manipulate, or mislead an auditor (whether internal or external) for the purpose of rendering misleading financial statements or for any other purpose.

61.     In a section titled "Ensure the Accuracy of Financial Reporting," the Code of

Conduct states:

As the wholly-owned subsidiary of a publicly-traded company, Modivcare is required to comply with federal and state laws and regulations with respect to the accuracy of the information it supplies to its parent company, Modivcare Inc., which is ultimately reported to the SEC and communicated to the public. The Company's financial statements are relied upon both internally and externally by individuals making business or investment decisions. Accuracy and candor are critical to the financial health of the Company. As a result, each Company team member, including every executive, officer, and member of management involved in the review, preparation, or substantiation of Modivcare Inc.'s SEC Reports and Public Documents (as defined below) must act in good faith, responsibly, and with due care and diligence to ensure that the Company provides full, fair, accurate, timely, and understandable information for Modivcare Inc.'s disclosures in its SEC Reports and Public Documents. The term "SEC Reports and Public Documents" means financial statements, reports, and other documents filed with or submitted to the SEC, as well as other public communications made by Modivcare Inc. or the Company.

Financial executives, officers, and other personnel involved in the review or preparation of SEC Reports and Public Documents must help ensure that SEC Reports and Public Documents fairly disclose the Company's assets, liabilities, and any material transactions made by the Company. Senior Financial Officers are responsible for the SEC Reports and Public Documents meeting the following requirements:

- SEC Reports and Public Documents must, in reasonable detail, accurately and fairly reflect the transactions engaged in by the Company and acquisitions and dispositions of the Company's assets

- SEC Reports and Public Documents must not contain any untrue statement of material fact that would make the statements in the SEC Reports and Public Documents misleading

- Financial reports must be prepared in accordance with, or reconciled to, Generally Accepted Accounting Principles ("GAAP") and applicable SEC rules, including the SEC accounting rules

- SEC Reports and Public Documents must contain full, fair, accurate, timely, and understandable disclosures

62.    In a section titled "Never Engage in Insider Trading," the Code of Conduct states, in relevant part:

Under federal securities laws, you cannot trade in Modivcare Inc.'s stock on the basis of material, non-public information, nor can you "tip" such material, non-public information to others who use it to trade in Modivcare Inc.'s stock. These laws are designed to ensure that all investors are on an equal footing and are relying upon the same information in making their investment decisions. The Company's Corporate Communications Policy sets forth the trading and reporting obligations of employees of public companies (or their wholly-owned subsidiaries) in greater detail. Every executive, officer, member of management, and employee of the Company has access to these policies and must strictly adhere to them at all times.

63.    In a section titled "Avoid Conflicts of Interest," the Code of Conduct states, in relevant part:

You must make every effort to avoid situations in which your personal interests conflict or appear to conflict with the interests of the Company. Even the suggestion of impropriety will hurt the valuable reputation the Company has worked so hard to establish. When in doubt about whether something constitutes a conflict of interest, ask your supervisor, the Chief Compliance Officer, or any member of the Legal Department. You may also submit your question through the Ethics Hotline (855-818-6929).

Every Modivcare team member is required to perform his/her responsibilities in a manner that furthers Modivcare's interests, and may not compromise those interests due to actual or perceived conflicts with other business matters or personal concerns. A conflict exists when your real or perceived personal interests interfere with or appear to interfere with the interests of the Company. To carry out our

business effectively, every team member must be loyal to the Company. You
should therefore refrain from entering into relationships that might impair your
judgment about what is best for the Company. Even relationships that give the
appearance of a conflict of interest should be avoided.

Conflicts of interest may arise in many ways, including, for example, receiving
improper personal benefits as a result of your position with the Company, or having
outside duties, responsibilities, or obligations that run counter to your duties to the
Company. Conflicts of interest may reach farther than just the person employed by
or otherwise serving the Company. In fact, many conflicts arise as a result of
situations involving the relative of an executive, officer, member of management,
or other team member.

64.     In a section titled "Conduct Business Fairly and with Integrity," the Code of

Conduct states, in relevant part:

**Deal Fairly with Business and Work Associates:**

Every Modivcare executive, officer, member of management, or other team
member must at all times deal fairly and in good faith with our clients and their
members, business partners, suppliers, competitors, stakeholders, regulators, and
co-workers. You must never take unfair advantage of anyone through manipulation,
concealment, misrepresentation, conspiracy, offers of illegal favors, or any other
unfair or unethical practices. Dealings with contractors, suppliers, and vendors
must be fair, and cannot be conditioned on requiring that they purchase services
from or otherwise deal with the Company. . . .

**Interacting with Regulators, Auditors, and Counsel**

Government authorities or lawyers for outside parties may seek to contact you
directly with respect to audits, reviews, investigations, or claims against the
Company. Inquiries by governmental or regulatory agencies or counsel must be
brought to the attention of the Legal Department before any information or response
is provided so that such inquiries may be coordinated and handled properly.

It is Modivcare's policy to cooperate fully with all duly-authorized governmental
inquiries and respond truthfully and completely in any legal action. Remember that
both you and the Company have a right to a lawyer in connection with any
government investigation. If you are contacted by a government investigator, you
have a right to have a lawyer present when you speak to the investigator, whether
that questioning occurs at your workplace or away from work after business hours.
If you are contacted by a third party about an investigation (or otherwise learn of
an investigation), you should contact the Legal Department immediately.

In addition, if you receive any written inquiry, subpoena, or other legal document

regarding Company business, whether at home or in the workplace, from any governmental agency, outside lawyer, or any other source, you should notify your supervisor or a member of the Legal Department immediately. More details about your rights and responsibilities with respect to contact by government agencies and officials, and legal counsel from any source, are found in the Employee Manual, "Employee Rights in Connections with Government Investigations and Interviews," and elsewhere in the Employee Manual.

## MODIVCARE'S AUDIT COMMITTEE CHARTER

65.    ModivCare's Audit Committee Charter states that the primary purpose of the Audit Committee is to:

[A]act on behalf of the Board of Directors (the "Board") of ModivCare, Inc., a Delaware corporation (the "Company"), in fulfilling the Board's oversight responsibilities with respect to the Company's corporate accounting and financial reporting processes, the systems of internal control over financial reporting, and audits of financial statements, as well as the quality and integrity of the Company's financial statements and reports and the qualifications, independence and performance of the firm or firms of certified public accountants engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing other audit, review or attest services (the "Auditors"). The Committee shall also provide oversight assistance in connection with the legal, regulatory and ethical matters that could have a material impact on the Company's operations and financial statements, including with respect to certain material Environmental, Social and Governance ("ESG") matters. In addition, the Committee shall have the primary responsibility for overseeing the Company's information technology ("IT"), data privacy and cybersecurity risks, controls and procedures. The operation of the Committee shall be subject to the Bylaws of the Company as in effect from time to time and Section 141 of the Delaware General Corporation Law.

66.    Under the "responsibilities" section, the Audit Committee Charter tasks the Audit Committee with the following responsibilities, among others:

1.    ***Tone at the Top***. To set the tone for the Company's financial reporting and the relationship with its Auditors. The Committee shall focus on the "tone at the top" with the objective of creating and maintaining an environment that supports the integrity of the financial reporting process and the independence of the audit, and set an expectation for clear and candid communications to and from the Auditors, and likewise to set an expectation with both management and the Auditors that the Committee will engage as reporting and control issues arise. The Committee shall proactively communicate with the Auditors to understand the audit strategy

and status, and ask questions regarding issues identified by the Auditors and understand their ultimate resolution. . . .

8.    ***Audited Financial Statement Review***. To review and discuss with the Auditors, upon completion of the audit, the financial statements (including the related notes) and the form of audit opinion to be issued by the Auditors on the financial statements proposed to be included in the Company's Registration Statements and Annual Report on Form 10-K to be filed with the SEC and to recommend whether or not such financial statements and opinion should be so included.

9.    ***Annual Audit Results***. To review and discuss with management and the Auditors the results of the annual audit, including the Auditors' assessment of the quality, not just acceptability, of accounting principles, the reasonableness of significant judgments and estimates (including material changes in estimates), significant unusual transactions, any material audit adjustments proposed by the Auditors and any adjustments proposed but not recorded, the adequacy of the disclosures in the financial statements and any other matters required to be communicated to the Committee by the Auditors under generally accepted auditing standards, including the standards of the PCAOB, as appropriate.

10.   ***Quarterly Results***. To review and discuss with management and the Auditors, as appropriate, the results of the Auditors' review of the Company's quarterly financial statements, prior to public disclosure of quarterly financial information, if practicable, or filing with the SEC of the Company's Quarterly Report on Form 10-Q, and any other matters required to be communicated to the Committee by the Auditors under generally accepted auditing standards, including standards of the PCAOB, as appropriate.

11.   ***Management's Discussion and Analysis***. To review and discuss with management and the Auditors, as appropriate, the Company's disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in its periodic reports to be filed with the SEC.

12.   ***Press Releases***. To review and discuss with management and the Auditors, as appropriate, earnings press releases, and press releases containing information relating to material developments as well as the substance of financial information, information relating to material developments and earnings guidance provided to analysts and ratings agencies, which discussions may be general discussions of the type of information to be disclosed or the type of presentation to be made. The Chairperson of the Committee may represent the entire Committee for purposes of this discussion.

13.     ***Accounting Principles and Policies***. To review and discuss with management and the Auditors, as appropriate, significant issues that arise regarding accounting principles and financial statement presentation, including critical accounting policies and practices, alternative accounting policies available under generally accepted accounting principles ("GAAP") related to material items discussed with management, changes and improvements in financial or accounting practices and internal controls, and any other significant reporting issues and judgments.

The Committee must understand whether - and how and why - management uses non-GAAP measures and performance metrics, and how those measures are used in addition to GAAP financial statements in the Company's financial reporting and in connection with internal decision making. The Committee shall be actively engaged in the review and presentation of non-GAAP measures and metrics to understand how management uses them to evaluate performance, whether they are consistently prepared and presented from period to period and the Company's related policies and disclosure controls and procedures.

14.     ***Risk Assessment and Management***. To review and discuss with management, the Company's guidelines and policies with respect to risk assessment and risk management, including the Company's major financial risk exposures and the steps taken by management to monitor and control these exposures; and to review and discuss with management insurance programs, including director and officer insurance, product liability insurance and general liability insurance (but excluding compensation and benefits related insurance).

15.     ***Information Technology, Data Privacy, and Cybersecurity Risk and Management***. To oversee the Company's programs, policies and procedures related to information technology and cybersecurity and data protection; to review and discuss with management, at least quarterly, the Company's cybersecurity and other information technology and data privacy risk assessments, controls, strategies, and procedures; to review and discuss with management, as needed, any significant cyber incidents that have occurred or are reasonably likely to occur; and to review and discuss with management, on a regular basis, cybersecurity trends and emerging information technology threats, if any.

16.     ***Management Cooperation with Audit***. To evaluate the cooperation received by the Auditors during their audit examination, including a review with the Auditors of any significant difficulties with the audit or any restrictions on the scope of their activities or access to required records, data and information, significant disagreements with management and management's response, if any.

17.     ***Internal Audit***. To monitor and assess the performance of the Company's internal audit function ("Internal Audit"), including the review of the appointment or termination of the head of Internal Audit, the review of all significant reports prepared by Internal Audit personnel, and the oversight of management's action plans. To provide guidance and support to Internal Audit as needed. To meet with the head of Internal Audit as the Committee deems appropriate. . . .

21.     ***Internal Control Over Financial Reporting***. To confer with management and the Auditors, as appropriate, regarding the scope, adequacy and effectiveness of internal control over financial reporting including significant deficiencies or material weaknesses identified by the Auditors. To review with management and the Auditors any fraud, whether or not material, that includes management or other employees who have any significant role in the Company's internal control over financial reporting and any significant changes in internal controls or other factors that could significantly affect internal controls, including any corrective actions in regard to significant deficiencies or material weaknesses.

22.     ***Separate Sessions***. Periodically, to meet in separate sessions with the Auditors, as appropriate, management and Internal Audit to discuss any matters that the Committee, the Auditors or management or Internal Audit believe should be discussed privately with the Committee.

23.     ***Correspondence with Regulators***. To consider and review with management, the Auditors, outside counsel, as appropriate, and, in the judgment of the Committee, such special counsel, separate accounting firm and other consultants and advisors as the Committee deems appropriate, any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies.

24.     ***Complaint Procedures***. To establish procedures, when and as required by applicable laws and rules, for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and the confidential and anonymous submission by employees of concerns regarding questionable accounting or auditing matters, and to establish such procedures as the Committee may deem appropriate for the receipt, retention and treatment of complaints received by the Company with respect to any other matters that may be directed to the Committee for review and assessment.

25.     ***Ethical Compliance; Compliance with Legal and Regulatory Requirements***. In coordination with the Board's Nominating and Corporate Governance Committee, to review the results of management's efforts to

monitor compliance with the Company's programs and policies designed to ensure adherence to applicable laws and rules, as well as to its Compliance and Ethics Plan and Code of Conduct, as amended from time to time, and regarding legal matters and compliance with legal and regulatory requirements, in each case that may have a material effect on the Company's business or financial statements, including any material reports or inquiries from regulatory or governmental agencies.

26. ***Regulatory and Accounting Initiatives***. To review with counsel, the Auditors, and/or management, as appropriate, any significant regulatory, legal, compliance, or accounting initiatives or matters that may have a material impact on the Company's financial statements, if, in the judgment of the Committee, such review is necessary or appropriate. . . .

30. ***Proxy Report***. To prepare the report required by the rules of the SEC to be included in the Company's annual proxy statement. . . .

32. ***Annual Charter Review***. To review and assess the adequacy of this Charter annually and recommend any proposed changes to the Board for approval.

33. ***Report to Board***. To report to the Board with respect to material issues that arise regarding the quality or integrity of the Company's financial statements, as well as any legal or regulatory compliance issues that could have a material impact on the Company's financial statements, the performance or independence of the Auditors or such other matters as the Committee deems appropriate from time to time or whenever it shall be called upon to do so.

34. ***Annual Committee Evaluation***. To conduct an annual evaluation of the performance of the Committee.

## SUBSTANTIVE ALLEGATIONS

*Background*

67. ModivCare is a technology-enabled healthcare services company that provides a suite of integrated supportive care solutions for public and private payors and their members.

68. The Company's three business segments are: (1) NEMT services; (ii) PCS; and (iii) in-home monitoring solutions.

69. Under its NEMT segment, the Company primarily provides services on a capitated basis, meaning payors pay a fixed amount per eligible member. With capitated contracts, the

Company assumes the responsibility of meeting the covered healthcare related transportation requirements based on on a per-member, per-month ("PMPM") fees for the number of eligible members in the customer's program. According to the Company's annual report for 2024 filed on a Form 10-K with the SEC on March 6, 2025 (the "2024 10-K"), in 2024, 80.9% of the Company's NEMT revenue came from capitated contracts.

70.     According to the 2024 10-K, the NEMT capitated contracts operate under either a full-risk or a shared-risk structure. Under full-risk contracts, payors pay a fixed amount per eligible member per month and ModivCare assumes the responsibility of meeting the covered healthcare related transportation requirements for the number of eligible members in the payor's program. This means that the Company assumes the full-risk for the costs associated with arranging transportation of members. Revenue is recognized based on the number of members served during the period. Under shared-risk contracts, the Company has provisions for reconciliations, risk corridors, and/or profit rebates. These contracts allow for periodic reconciliations based on actual cost and or/trip volume and may result in refunds to the payor (contract payables), or additional payments due from the payor (contract receivables) based on the provisions contractually agreed upon. These shared-risk contracts also allow for margin stabilization, as generally the amount received PMPM is adjusted for the costs to provide the transportation services.

71.     The Company also provides services on a fee-for-service ("FFS") basis through its NEMT segment, under which fees are generated based upon billing rates for specific services or defined membership populations. According to the 2024 10-K, under FFS contracts, payors pay a specified amount for each service provided based on costs incurred plus an agreed-upon margin. FFS revenue is recognized by the Company in the period in which the services are rendered and is reduced by the estimated impact of contractual allowances.

72.     Payment for the Company's NEMT services are rendered from third-party payors, primarily from state Medicaid agencies and managed care organizations ("MCOs"), including Medicare agencies.

73.     From 2020 through the end of 2022, nearly all of the Company's NEMT capitated contracts were "full-risk."

74.     Throughout the Relevant Period, the Individual Defendants touted certain of the Company's contracts used in its NEMT segment, highlighting these contracts as mitigating risks to the Company's free cash flow. However, in reality, ModivCare's free cash flow was rapidly deteriorating.

***The Individual Defendants' Materially False and Misleading Statements***

75.     On November 3, 2022, the Company issued a press release announcing its financial results for the third quarter of 2022 (the "3Q22 Earnings Release"). The 3Q22 Earnings Release stated, in relevant part:

### Third Quarter 2022 Highlights:

- Revenue of $647.8 million, a 31.4% increase as compared to $493.1 million in Q3 2021
- Net loss of $28.5 million or $2.03 per diluted common share was primarily attributable to a goodwill impairment for Matrix
- Adjusted EBITDA of $51.8 million, Adjusted Net Income of $22.7 million and Adjusted EPS of $1.61
- Net cash used in operating activities during the quarter of $5.7 million
- Cash and cash equivalents of $72.7 million as of September 30, 2022, with $1,000.0 million principal amount of debt outstanding related to the Senior Unsecured Notes due 2025 and 2029
- Undrawn $325.0 million revolving credit facility as of September 30, 2022

76.     Defendant Sampson was quoted in the 3Q22 Earnings Release as stating, in relevant part, that "[w]e delivered another solid quarter highlighted by over 30 percent revenue growth as compared to the same quarter last year, driven by 23 percent membership growth from our non-

emergency medical transportation business and 43 percent revenue growth from our personal care

business."

77.     On the same day, the Company hosted an earnings call for investors and analysts

to discuss its financial results for the third quarter of 2022 (the "3Q22 Earnings Call"). During the

3Q22 Earnings Call, Defendant Sampson highlighted the benefits of the capitated contracts to the

NEMT segment, stating, in relevant part:

> On the transportation side, as you know, most of our -- 85% of our contracts are
> capitated. So there's really no kind of reimbursement change in the NEMT side. It
> is really about how we manage through that. In addition, and this is also something
> we've done over the last 12 to 18 months, is ensuring our contracts have been
> structured so we have a win-win, and able to share in these increased costs that are
> currently happening primarily in the transportation with the driver. So that's been
> beneficial to us. So those costs have come up that our transportation providers
> actually have to bear.

78.     On November 8, 2022, the Company filed a quarterly report for the period ended

September 30, 2022, on a Form 10-Q with the SEC (the "3Q22 10-Q"). In addition to reiterating

the previously disclosed financial results, the Company touted the increase in service revenue in

the NEMT segment, due, in part, to its capitated contracts, stating:

> *Service revenue, net.* Service revenue, net, increased by $86.8 million and 23.3%,
> during the three months ended September 30, 2022 as compared to the three months
> ended September 30, 2021. This increase is primarily attributable to a 16.1%
> increase in trip volume, a 22.6% increase in average monthly membership and
> higher rates per member as compared to the three months ended September 30,
> 2021. . . . ***The increase in average monthly membership drove higher revenue
> because a majority of our contacts [sic] are capitated and we receive monthly
> payments on a per member/fixed basis in return for full or partial risk of
> transportation volumes***.

(Emphasis added).

79.     The 3Q22 10-Q was signed by Defendant Sampson. The 3Q22 10-Q was also

accompanied by certifications made by Defendant Sampson pursuant to Sections 13a-14 and 15d-

15 of the Exchange Act and Section 906 of the Sarbanes-Oxley Act of 2002 (the "SOX

Certifications"), wherein he attested to the accuracy of the 3Q22 10-Q.

80.     On February 23, 2023, the Company issued a press release announcing its financial results for the fourth quarter and full year of 2022 (the "4Q22 Earnings Release"). The 4Q22 Earnings Release reported that:

### Fourth Quarter 2022 Highlights:
- Service revenue of $653.9 million, a 14% increase as compared to $575.8 million in the fourth quarter of 2021
- Net loss of $6.9 million, or $0.49 per diluted common share
- Adjusted EBITDA of $59.7 million, adjusted net income of $29.8 million and adjusted EPS of $2.11 per diluted common share
- Net cash used in operating activities during the quarter of $56.0 million
- Cash and cash equivalents of $14.5 million as of December 31, 2022, with $1,000.0 million principal amount of debt outstanding related to the Senior Unsecured Notes due 2025 and 2029

### Full Year 2022 Highlights:
- Service revenue of $2,504.4 million, a 25% increase as compared to $1,996.9 million in 2021
- Net loss of $31.8 million, or $2.26 per diluted common share
- Adjusted EBITDA of $221.9 million, adjusted net income of $103.4 million and adjusted EPS of $7.32 per diluted common share
- Net cash used in operating activities in 2022 of $10.4 million
- On February 3, 2022, Modivcare Inc. entered into a new senior secured revolving credit facility with total borrowing capacity of $325.0 million and a maturity date in February 2027. This new facility was undrawn at closing and replaces the Company's prior $225.0 million revolving credit facility.

81.     On March 7, 2023, the Company filed its annual report for 2022 on a Form 10-K with the SEC (the "2022 10-K"). In addition to affirming the Company's previously stated financial results, the 2022 10-K touted the increase in service revenue in the NEMT segment due to capitated contracts, stating, in relevant part:

> *Service revenue, net.* Service revenue, net, increased by $284.7 million and 19.2%, from 2021 to 2022. This increase is primarily attributable to a 12.9% increase in trip volume, a 14.4% increase in average monthly membership and higher rates per member as compared to the year ended December 31, 2021. . . .The increase in average monthly membership drove higher revenue because a majority of our contacts are capitated and we receive monthly payments on a per member/fixed basis in return for full or partial risk of transportation volumes.

82.     The 2022 10-K was signed by Defendants Sampson, Shackelton, Carter, Coulter,

Kerley, Norwalk, Wright, Samant, Saal, and Graham. The 2022 10-K was also accompanied by

SOX Certifications made by Defendant Sampson, wherein he attested to the accuracy of the 2022

10-K.

83.     On May 1, 2023, the Company filed its annual proxy statement on a Schedule 14A

with the SEC (the "2023 Proxy"). The 2023 Proxy assured investors that the Board was actively

overseeing risks to the Company, stating, in relevant part:

> The Board's Role in Risk Oversight
>
> The Board has an active role, as a whole and at the committee level, in overseeing
> management of the Company's risks. The Board regularly reviews information
> regarding the Company's credit, liquidity and operations, as well as the risks
> associated with each. The Company's Compensation Committee is responsible for
> overseeing the management of risks relating to the Company's executive
> compensation plans and arrangements. The Audit Committee oversees
> management of financial risks. The Nominating and Governance Committee
> manages risks associated with the independence of the Board, potential conflicts of
> interest as well as legal and regulatory compliance. While each committee is
> responsible for evaluating certain risks and overseeing the management of such
> risks, the entire Board is regularly informed through attendance at committee
> meetings or committee reports about such risks. In addition, members of senior
> management regularly provide reports to the Board about their respective areas of
> responsibility and any related risks. These reports include actions taken by senior
> management to monitor and control such risks.

84.     The 2023 Proxy also stated that the Audit Committee, among other things, reviewed

the Company's internal controls over financial reporting and recommended to the Board that the

audited financial statements be included in the 2022 10-K, stating, in relevant part:

> The Audit Committee has reviewed and discussed with management its assessment
> and report on the effectiveness of ModivCare's internal control over financial
> reporting as of December 31, 2022, which it made using the criteria established in
> Internal Control-Integrated Framework (2013) issued by the Committee of
> Sponsoring Organizations of the Treadway Commission. The Audit Committee has
> also reviewed and discussed with KPMG, the Company's independent registered
> public accounting firm, its review and report on ModivCare's internal control over

financial reporting. ModivCare published these reports in its 2022 Annual Report.

The Audit Committee has reviewed and discussed with management and KPMG the audited consolidated financial statements of ModivCare for the fiscal year ended December 31, 2022. Management represented to the Audit Committee that ModivCare's consolidated financial statements were prepared in accordance with generally accepted accounting principles in the United States. The Audit Committee also discussed with representatives of KPMG the matters required to be discussed by the applicable requirements of the Public Company Accounting Oversight Board ("PCAOB").

The Audit Committee received the written disclosures and the confirming letter from KPMG required by applicable requirements of the PCAOB regarding the independent accountant's communications with the Audit Committee concerning independence and discussed with KPMG its independence from ModivCare.

Based on these reviews and discussions and in reliance thereon, the Audit Committee recommended to the Board that the audited financial statements be included in the 2022 Annual Report.

85.    On May 4, 2023, the Company issued a press release announcing its financial results for the first quarter of 2023 (the "1Q23 Earnings Release"). The 1Q23 Earnings Release stated, in relevant part:

> **First Quarter 2023 Highlights:**
> - Service revenue of $662.3 million, a 15.3% increase as compared to $574.5 million in Q1 2022
> - Net loss of $4.0 million or $0.28 per diluted common share
> - Adjusted EBITDA[] of $50.2 million, adjusted net income[] of $20.2 million and adjusted EPS[] of $1.42 per diluted common share
> - Net cash used in operating activities during the quarter of $2.7 million
> - Cash and cash equivalents of $12.8 million as of March 31, 2023, with $1.0 billion principal amount of debt outstanding related to the Senior Unsecured Notes due 2025 and 2029
> - $15.0 million drawn on the $325.0 million revolving credit facility as of March 31, 2023

86.    The statements identified in ¶¶ 75 through 85 were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose, *inter alia*, that: (i) certain of the Company's contracts in its NEMT segment were causing ModivCare's free cash flow to deteriorate; (ii) as a result, the Company's

contract renegotiations and pricing accommodations were negatively impacting the Company's adjusted EBITDA; (iii) as a result, the Company had insufficient liquidity; (iv) the Company failed to maintain adequate internal controls and risk oversight over its financial reporting; and (v) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

87.     On the same day it issued the 1Q23 Earnings Release, the Company also hosted the 1Q23 Earnings Call, wherein Defendant Shepard revealed that the Company experienced a reduction of cash flow from operations during the quarter, stating, in relevant part:

> Consolidated cash-flow from operations in the first quarter of 2023 was the use of approximately $3 million due to a $7 million reduction in contract payables and $31 million increase in contract receivables. Excluding these items, our cash flow from operation would have been better in the first quarter by $38 million.

88.     On this news, the Company's stock price declined $11.30 per share, or approximately 16%, to close at $58.00 per share on May 4, 2023.

89.     Despite this, the Individual Defendants continued to mislead investors and assure them that the Company was on track. Indeed, during the same 1Q23 Earnings Call, Defendant Sampson assured investors that the Company made arrangements to account for Medicaid redetermination (i.e., Medicaid coverage renewal that may result in loss coverage for those beneficiaries who are no longer eligible for Medicaid) by transitioning many of its full-risk contracts to shared-risk contracts. Specifically, Defendant Sampson stated:

> Additionally, we've been preparing for redetermination over the last several months. When we exit the pandemic in 2020 and 2021, we made a conscious effort to effectively and efficiently transition, a large portion of our previous full-risk contracts to contracts that are shared risk or fee-for-service arrangements, protecting ourselves and our customers. These shared risk contracts significantly derisk the financial impact from redetermination by setting contractual revenue rates, primarily based on trip volumes as opposed to membership. In many situations, we can fully offset the gross profit impact from lower membership from re-determination as these contracts reset monthly.

Our remaining full-risk capitated contracts currently only account for approximately 20% of NEMT revenue, compared to 60% at the start of the pandemic. For these contracts we will continue to have anticipated contract repricing negotiations throughout the year, and annual actuarial pricing reset that allow us to normalize pricing in a post-redetermination environment. As it relates to our membership, we continue to believe that we can grow through the 10% to 15% redetermination headwinds through 2025, based on our new contract wins, existing market expansion, Medicare advantage growth, and just the underlying Medicaid market growth. In total, we believe that we have encapsulated the impact from redetermination in our 2023 outlook, as well as our 2024 outlook.

90.    Also on May 4, 2023, the Company filed a quarterly report for the period ended March 31, 2023, on a Form 10-Q with the SEC (the "1Q23 10-Q"). In addition to affirming the Company's previously stated financial results for the first quarter of 2023, the 1Q23 10-Q touted the increase in service revenue in the NEMT segment due to capitated contracts, stating, in relevant part:

> *Service revenue, net.* Service revenue, net, increased by $68.5 million, or 17.1%, during the three months ended March 31, 2023 as compared to the three months ended March 31, 2022. This increase is primarily attributable to a 15.3% increase in trip volume, a 4.7% increase in average monthly membership and higher rates per member as compared to the three months ended March 31, 2022. . . .The increase in average monthly membership drove higher revenue because a majority of our contacts are capitated and we receive monthly payments on a per member/fixed basis in return for full or partial risk of transportation volumes.

91.    The 1Q23 10-Q was signed by Defendant Sampson and was also accompanied by SOX Certifications made by Defendant Sampson, wherein he attested to the accuracy of the 1Q23 10-Q.

92.    On August 3, 2023, the Company issued a press release announcing its financial results for the second quarter of 2023 (the "2Q23 Earnings Release"). The 2Q23 Earnings Release stated, in relevant part:

> **Second Quarter 2023 Highlights:**
> - Service revenue of $699.1 million, an 11.3% increase as compared to $628.2 million in the second quarter of 2022

- Net loss of $190.9 million or $13.47 per diluted common share, primarily attributable to goodwill impairment of $183.1 million
- Adjusted EBITDA[] of $52.4 million, adjusted net income[] of $20.8 million and adjusted EPS[] of $1.47 per diluted common share
- Cash used in operating activities during the quarter of $108.2 million along with capex spend of $8.9 million
- Contract payables decreased by $78.5 million to $109.1 million and contract receivables increased by $17.4 million to $119.8 million, resulting in net contract receivables of $10.7 million as of June 30, 2023
- $126.5 million drawn on the $325.0 million revolving credit facility as of June 30, 2023
- Amended credit agreement's maximum Total Net Leverage Ratio to provide improved access to liquidity

93.     The statements contained in ¶¶ 89 through 92 were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose, *inter alia*, that: (i) certain of the Company's contracts in its NEMT segment were causing ModivCare's free cash flow to deteriorate; (ii) as a result, the Company's contract renegotiations and pricing accommodations were negatively impacting the Company's adjusted EBITDA; (iii) as a result, the Company had insufficient liquidity; (iv) the Company failed to maintain adequate internal controls and risk oversight over its financial reporting; and (v) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

94.     Also on August 3, 2023, the Company hosted the 2Q23 Earnings Call, wherein the Company revealed that the Company experienced the expansion of a "large payable balance," which impacted the Company's cash flow. Specifically, Defendant Sampson stated:

> Next, I'd like to address our second quarter cash flow from operations, which was negative $108 million, mainly due to a $96 million decrease in our net contract payables, less receivable balance during the quarter, along with a onetime $9.6 million arbitration settlement with a former employee. Post the pandemic, coupled with a shift to more shared risk NEMT contracts, we experienced a temporary timing mismatch between payments and collections, which created a large payable balance that we've been reducing over the past year.

95.     On this news, ModivCare's stock price declined $2.86 per share, or approximately 7%, to close at $35.58 per share on August 4, 2023

96.     However, the Individual Defendants continued to mislead investors on the Company's financial prospects. During the 2Q23 Earnings Call, Defendant Sampson later touted the benefits of the new shared-risk contracts to investors, stating, in relevant part:

> And the one point that you hit on again, which is really important, it's really critical, especially if some of these new coming into here, looking at that delta between the contract payables and contracts receivables. I'm just repeating what you said again, this is the first time that it's flipped to a receivable. So then your question more broadly, how does this work? Basically, our contracts are working post COVID. So the contracts that we've restructured primarily around really implementing these shared risk contracts have been very helpful for us and help protect our kind of long-term margin. So that's -- you will see fluctuations as we move through the years going in quarters. Those will still fluctuate.

> So the good thing now though, because of the COVID benefits -- now the contracts are going to work or they are. And I think they'll bump around. But the good thing is we have the receivables and the payables. And because we have so many contracts, we expect that to be kind of a normalized working capital fluctuations in and out, not the big swings like we've seen over the last couple of quarters.

> And then the other item coming out of COVID now, all the states or MCOs, we have more predictable and rigid time frame for when we paid us back. So it really is kind of a 3- to 6-month time frame. So this predictability and normalization coming out of COVID allows us to have a more predictable cash flow and then a more normalized working capital. So which is why we have a lot of confidence in the back part of this year that we will generate cash flow in accordance with how our P&L works. And I expect that to continue throughout the quarter into 2024.

97.     Also during the 2Q23 Earnings Call, Defendant Shepard told investors that the Company's new shared-risk contracts would continue to increase revenue, stating, in relevant part:

> Shifting to guidance. We raised our revenue guidance to a range of $2.75 billion to $2.8 billion, and we lowered our adjusted EBITDA guidance to a range of $200 million to $210 million. The increased revenue guidance was primarily due to higher NEMT utilization and transportation costs driving more revenue from our shared risk contracts. We lowered our adjusted EBITDA guidance due to the higher NEMT utilization and the [indiscernible] costs and a delay in the start of some of our new contract wins, which will start in early 2024.

To sum things up, our second quarter results were mixed compared to our expectations as revenue was better than expected due to shared risk, cost protection in our NEMT business and adjusted EBITDA was slightly below plan due to higher utilization. Despite these results and our guidance reset, we remain confident about our mission and long-term growth strategy, along with the expected benefits from the initiatives to drive efficiencies and create operating leverage. Our team is working diligently to win new business and improve cash flow, and I want to thank everyone at Modivcare for their hard work and dedication in providing high-quality care and delivering the best experience for our members.

98.    On August 4, 2023, the Company filed a quarterly report for the period ended June 30, 2023, on a Form 10-Q with the SEC (the "2Q23 10-Q"). The 2Q23 10-Q assured investors that the Company's contracts were fueling the growth of the NEMT segment, stating, in relevant part:

*Service revenue, net*. Service revenue, net, increased by $48.2 million, or 10.8%, during the three months ended June 30, 2023 as compared to the three months ended June 30, 2022. This increase is primarily attributable to a 9.0% increase in revenue per member per month due to contract repricing and the partial pass-through of costs associated with higher trip utilization in our shared risk contracts, along with a 1.5% increase in average monthly members. Service revenue, net, increased by $116.8 million, or 13.7%, during the six months ended June 30, 2023, primarily attributable to a 10.5% increase in revenue per member per month driven by the same reason as above, including a 3.1% increase in average monthly membership.

The increase in average monthly members drove higher revenue because a majority of our contracts are capitated, and we receive monthly payments on a per member per month basis in return for full or shared risk of transportation volumes. Member growth was anticipated under existing contracts, but it was partially offset by delayed contract wins, certain contract losses, and the impacts of Medicaid redetermination. Most capitated contracts have been restructured to shared risk, resulting in increased rate per member with higher trip volume but not fully offsetting the rise in service expense, leading to a decrease in overall margin. Furthermore, higher trip volume in full risk contracts does not result in corresponding rate increases, and thus, does not contribute to increases in revenue. Trip volume increases also positively affected revenue for fee-for-service contracts due to a larger number of services performed.

99.    The 2Q23 10-Q was signed by Defendant Sampson and was also accompanied by SOX Certifications made by Defendant Sampson, wherein he attested to the accuracy of the 2Q23 10-Q.

100.    On November 2, 2023, the Company issued a press release announcing its financial

results for the third quarter of 2023 (the "3Q23 Earnings Release"). The 3Q23 Earnings Release

reported that:

> **Third Quarter 2023 Highlights:**
> - Service revenue of $686.9 million, a 6.0% increase as compared to $647.8 million in the third quarter of 2022
> - Net loss of $4.3 million or $0.30 per diluted common share
> - Adjusted EBITDA[] of $51.3 million, adjusted net income[] of $20.5 million and adjusted EPS[] of $1.44 per diluted common share
> - Cash provided by operating activities during the quarter of $53.5 million and free cash flow[] of $44.7 million
> - Contract receivables increased by $9.5 million to $129.3 million and contract payables increased by $24.5 million to $133.6 million, resulting in net contract payables of $4.3 million as of September 30, 2023
> - Repaid $43.5 million on the $325.0 million revolving credit facility, reducing the balance drawn to $83.0 million as of September 30, 2023
> - $138.0 million of NEMT managed Medicaid total contract value (TCV) won during third quarter 2023; awarded a state Medicaid expansion in the northeast that will be implemented in mid-2024 once finalized; national MCO contract won earlier in 2023 implemented during the quarter

101. On the same day, the Company hosted an earnings call for investors and analysts

to discuss its financial results for the third quarter of 2023 (the "3Q23 Earnings Call"). During the

3Q23 Earnings Call, Defendant Sampson assured investors that the Company's shared-risk

contracts were "operating effectively," stating, in relevant part:

> Our shared risk contracts are operating effectively and as intended, safeguarding our gross margins against the backdrop of increasing utilization and costs. The challenges brought about by Medicaid redetermination notwithstanding, our margins consistently match our forecast. This instills confidence in the accuracy of our internal redetermination model. As it stands, we are going to be in line with our 2023 expectations for redetermination as well as our expectations for 2024, which we expect to be a $20 million to $40 million impact.

102. Defendant Sampson also stated during the 3Q23 Earnings Call that "our shared risk

contracts with the customers are protecting the downside to our cash flow."

103. Also on November 3, 2023, the Company filed a quarterly report for the period

ended September 30, 2023, on a Form 10-Q with the SEC (the "3Q23 10-Q"). In the 3Q23 10-Q,

the Company assured investors that the Company's contracts were fueling the growth of the NEMT segment, stating, in relevant part:

> *Service revenue, net*. Service revenue, net, increased by $26.2 million, or 5.7%, during Q3 2023 as compared to Q3 2022. This increase is primarily attributable to a 13.2% increase in revenue per member per month, which was driven by a 9.7% increase in trip volume. These two factors are correlated due to contract repricing and the partial pass-through of costs associated with our shared risk contracts. This increase to revenue was partially offset by a 6.6% decrease in average monthly members primarily due to Medicaid redetermination. Service revenue, net, increased by $142.9 million, or 10.9%, during YTD 2023 as compared to YTD 2022, primarily attributable to a 11.2% increase in revenue per member per month driven by a 12.1% increase in trip volume, partially offset by a 0.3% decrease in average monthly membership.
>
> The change in revenue is impacted by both the change in average monthly members, as well we the rate received per member. The change in average monthly members is correlated to the change in revenue because a majority of our contracts are capitated, and we receive monthly payments on a per member per month basis in return for full or shared risk of transportation volumes. Declines in membership over the periods presented were anticipated and primarily related to Medicaid redetermination efforts, along with certain contract losses. While membership decreased, revenue increased due to increases in the average rate received per member, which increases in line with increases in utilization or trip volume in our shared risk contracts. As most of our capitated contracts have been restructured to a shared risk format, revenue increased despite the decline in membership. Trip volume increases also positively affected revenue for fee-for-service contracts due to a larger number of services performed.

104.    The 3Q23 10-Q was signed by Defendants Sampson and Gutierrez and was also accompanied by SOX Certifications made by Defendants Sampson and Gutierrez, wherein they attested to the accuracy of the 3Q23 10-Q.

105.    On February 22, 2024, the Company issued a press release announcing its financial results for the fourth quarter and full year of 2023 (the "4Q23 Earnings Release"). The 4Q23 Earnings Release stated, in relevant part:

**<u>Fourth Quarter 2023 Summary:</u>**
- Service revenue of $702.8 million, a 7.5% increase as compared to $653.9 million in the fourth quarter of 2022
- Net loss of $5.3 million, or $0.37 per diluted common share

- Adjusted EBITDA[] of $50.5 million, adjusted net income[] of $18.4 million and adjusted EPS[] of $1.29 per diluted common share
- Net cash used in operating activities during the quarter of $25.6 million and negative free cash flow[] of $36.8 million, primarily related to a delayed payment from a single client
- Contract receivables increased by $14.7 million to $144.0 million and contract payables decreased by $16.1 million to $117.5 million, resulting in net contract receivables of $26.5 million as of December 31, 2023
- $216.2 million of NEMT TCV[] won during the fourth quarter of 2023, including sizable managed Medicaid contracts contributing to total new wins that will outpace contract attrition in 2024
- $113.8 million drawn on our $325.0 million revolving credit facility
- As a subsequent event, in early 2024 we amended the leverage covenant to provide additional cushion for credit facility availability, ensuring sufficient liquidity

**Full Year 2023 Summary:**
- Service revenue of $2,751.2 million, a 9.9% increase as compared to $2,504.4 million in 2022
- Net loss of $204.5 million, or $14.43 per diluted common share
- Adjusted EBITDA[] of $204.4 million, adjusted net income[] of $79.9 million and adjusted EPS[] of $5.60 per diluted common share
- Net cash used in operating activities in 2023 of $83.0 million and negative free cash flow[] of $125.3 million
- Contract receivables increased by $72.8 million to $144.0 million and contract payables decreased by $76.8 million to $117.5 million
- In 2023, won $463.5 million of NEMT TCV[] or $141.8 million ACV[], as well as $10.6 million in ACV[] for remote patient monitoring

106. The statements contained in ¶¶ 96 through 105 were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose, *inter alia*, that: (i) certain of the Company's contracts in its NEMT segment were causing ModivCare's free cash flow to deteriorate; (ii) as a result, the Company's contract renegotiations and pricing accommodations were negatively impacting the Company's adjusted EBITDA; (iii) as a result, the Company had insufficient liquidity; (iv) the Company failed to maintain adequate internal controls; and (v) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

107.    On the same day, the Company hosted the 4Q23 Earnings Call, during which Defendant Sampson revealed that the Company suffered negative cash flow during the fourth quarter and that the Company expected this trend to continue into the first half of 2024, stating, in relevant part:

> Firstly, our free cash flow for the fourth quarter was negative $37 million, which was below expectations, primarily due to delay in payment from an MCO client within a specific contract in Florida. Looking ahead, and primarily to us managing redetermination and the increased healthcare utilization environment, we anticipate our free cash flow for the first half of the year will be constrained to the ongoing build in contract receivables and the settlement of several large payables expected in the second quarter.

108.    On this news, the Company's stock price declined $17.25 per share, or approximately 39%, to close at $26.62 per share on February 23, 2024.

109.    Despite this, the Company continued to mislead investors. For instance, later during the 3Q23 Earnings Call, Defendant Gutierrez assured investors that the NEMT segment's margin was protected due to the new shared-risk contracts, stating, in relevant part:

> Turning to a review of our segment financials. NEMT fourth quarter revenue increased 9% year-over-year to $499 million. Total membership decreased 5.5% year-over-year to 32.9 million members, and we averaged 33.6 million members for all of 2023. On a sequential basis, average monthly members decreased 2% during the fourth quarter, primarily due to Medicaid redetermination, which was in line with our expectations.
>
> Trip volume increased 13% in the fourth quarter, while revenue per trip decreased 3.5% due to mix changes and an approximate 1% decrease in purchased services expense per trip, which drives the revenue in our shared risk contracts. Sequentially, NEMT gross margin increased 150 basis points as payroll and other expense per trip decreased 6% to $6.89, while purchase services per trip increased 2.5% to $42.24. The reduction in payroll and other expense per trip is being driven by our cost saving initiatives that Heath discussed, which are reducing our calls per trip. . . .
>
> As a reminder, our margins are protected from increased utilization from redetermination on our shared risk contracts. Our shared risk Medicaid contracts accounted for approximately 60% of our NEMT revenue in 2023. Even though we'll lose some Medicaid members in these contracts, we expect higher pass

through revenue under our shared risk contracts. Finally, the remainder of NEMT revenue, approximately 20% is generated from Medicaid advantage and fee-for-service arrangements.

110.    On February 26, 2024, the Company filed its annual report for 2023 on a Form 10-K with the SEC (the "2023 10-K"). The 2023 10-K stated, in relevant part:

> *Service revenue, net.* Service revenue, net, increased by $183.0 million, or 10.3%, during 2023 as compared to 2022. This increase is primarily attributable to a 12.1% increase in revenue per member per month, which was driven by a 12.2% increase in trip volume. These two factors correlated due to contract repricing and the partial pass-through of costs associated with our reconciliation, risk corridor or profit rebate contracts (which are considered shared-risk contracts due to the reconciliation provisions). This increase to revenue was partially offset by a 1.6% decrease in average monthly membership primarily as a result of Medicaid redetermination.
>
> The change in revenue is impacted by both the change in average monthly members as well as the rate received per member. The change in average monthly members is correlated to the change in revenue because a majority of our contracts are capitated, and we receive monthly payments on a per member per month basis in return for full or shared risk of transportation volumes. Declines in membership over the periods presented were anticipated and primarily related to Medicaid redetermination efforts, along with certain contract losses. ***While membership decreased, revenue increased due to increases in the average rate received per member, which increases in line with increases in utilization or trip volume in our shared risk contracts. As most of our capitated contracts have been restructured to a shared risk format, revenue increased despite the decline in membership***. Trip volume increases also positively affected revenue for fee-for-service contracts due to a larger number of services performed.

(Emphasis added).

111.    The 2023 10-K was signed by Defendants Sampson, Gutierrez, Shackelton, Carter, Coulter, Kerley, Norwalk, Wright, Samant, and Graham. The 2023 10-K was also accompanied by SOX Certifications made by Defendants Sampson and Gutierrez, wherein they attested to the accuracy of the 2023 10-K.

112.    On April 29, 2024, the Company filed its annual proxy statement on a Schedule 14A with the SEC (the "2024 Proxy"). The 2024 Proxy assured investors that the Board was

actively overseeing risks to the Company, stating, in relevant part:

> The Board's Role in Risk Oversight
>
> The Board has an active role, as a whole and at the committee level, in overseeing management of the Company's risks. The Board regularly reviews information regarding the Company's credit, liquidity and operations, as well as the risks associated with each. The Company's Compensation Committee is responsible for overseeing the management of risks relating to the Company's executive compensation plans and arrangements. The Audit Committee oversees management of financial risks as well as the Company's information technology, data privacy and cybersecurity risks. The Nominating and Governance Committee manages risks associated with the independence of the Board, potential conflicts of interest as well as legal and regulatory compliance. The Audit Committee and the Nominating and Governance Committee jointly oversee the Company's ESG and climate-related risks, with the Audit Committee focusing on such matters that relate to financial reporting or processes that could have a material impact on the Company's operations, financial statements, or reporting obligations and the Nominating and Governance Committee focusing on such matters that relate to governance. While each committee is responsible for evaluating certain risks and overseeing the management of such risks, the entire Board is regularly informed through attendance at committee meetings or committee reports about such risks. In addition, members of senior management regularly provide reports to the Board about their respective areas of responsibility and any related risks. These reports include actions taken by senior management to monitor and control such risks.

113.    The 2024 Proxy also included the "Audit Committee Report," which assured investors that the Company had remediated its internal controls over financial reporting and stated that the Audit Committee recommended to the Board that the audited financial statements be included in the 2023 10-K, stating, in relevant part:

> The Audit Committee has reviewed and discussed with management its assessment and report on the effectiveness of ModivCare's internal control over financial reporting as of December 31, 2023, which it made using the criteria established in Internal Control-Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. The Audit Committee has also reviewed and discussed with KPMG, the Company's independent registered public accounting firm, its audit and report on ModivCare's internal control over financial reporting. ModivCare published these reports in its 2023 Annual Report.
>
> With respect to the Company's previously disclosed internal control over financial reporting material weakness remediation efforts, the Company's management, which is being overseen and held accountable by the Audit Committee in this effort,

has made significant strides in fully remediating and eliminating a number of the identified deficiencies culminating in the material weakness. As disclosed in the 2023 Annual Report, during the fiscal year ended December 31, 2023, management completed the remediation efforts necessary to remediate and eliminate fully and effectively the material weaknesses concerning the Company's NEMT and Corporate and Other segments related to the payroll processing function and change management and logical access controls, and the Company's PCS segment related to its reporting lines and identification of appropriate authorities and responsibilities. The Audit Committee continues to motivate management to focus on projects that automate, standardize, and centralize the Company's control environment as it continues to integrate the PCS segment and remediate and eliminate fully and effectively the remaining deficiencies in the Company's internal control over financial reporting.

The Audit Committee has also reviewed and discussed with management and KPMG the audited consolidated financial statements of ModivCare for the fiscal year ended December 31, 2023. Management represented to the Audit Committee that ModivCare's consolidated financial statements were prepared in accordance with generally accepted accounting principles in the United States. The Audit Committee also discussed with representatives of KPMG the matters required to be discussed by the applicable requirements of the Public Company Accounting Oversight Board ("PCAOB").

The Audit Committee received the written disclosures and the confirming letter from KPMG required by applicable requirements of the PCAOB regarding the independent auditor's communications with the Audit Committee concerning independence and discussed with KPMG its independence from ModivCare.

Based on these reviews and discussions and in reliance thereon, the Audit Committee recommended to the Board that the audited financial statements be included in the 2023 Annual Report.

114.    On May 2, 2024, the Company issued a press release announcing its financial results for the first quarter of 2024 (the "1Q24 Earnings Release"). The 1Q24 Earnings Release reported, in relevant part:

**First Quarter 2024 Summary:**
- Service revenue of $684.5 million increased 3.3% from the first quarter of 2023
- Net loss of $22.3 million or $1.57 per diluted common share
- Adjusted EBITDA[] of $32.1 million, adjusted net loss[] of $1.2 million and adjusted EPS[] of negative $0.09 per diluted common share
- Cash provided by operating activities during the quarter of $9.6 million and free cash flow[] of $1.7 million

- Contract receivables, net of contract payables, of $25.9 million as of March 31, 2024
- Won $171.2 million of NEMT total contract value (TCV) during first quarter 2024 ($36.4 million annual contract value (ACV)), with implementation beginning in the second quarter of 2024

115.    On the next day, the Company hosted an earnings call to discuss its financial results for the first quarter of 2024 (the "1Q24 Earnings Call"). During the 1Q24 Earnings Call, Defendant Gutierrez reported that the Company's average NEMT membership decreased due to contract losses and Medicaid determinations, but assured investors that the NEMT margin would improve throughout 2024 due to new contracts, stating, in relevant part:

> NEMT revenue incrementally benefited from successful execution of contract settlements and negotiated pricing increases that were more favorable than expected. Average monthly membership decreased 12% sequentially to $29.1 million due to previously announced contract losses and Medicaid redetermination. . . .
>
> NEMT adjusted EBITDA was in line with our expectations at $27 million or 5.7% of revenue. We expect to see margins improve throughout the year due to the onboarding of new contracts in the second and third quarters as well as the execution of our cost initiatives. During the first quarter, our membership was impacted by Medicaid redetermination of approximately 600,000 members. Our top 5 states with full-risk contracts are 80% through their respective redetermination period. Redetermination impacted first quarter revenue by $10 million and adjusted EBITDA by approximately $5 million. Overall, Medicaid redetermination is tracking in line to slightly better than we previously expected.

116.    The statements contained in ¶¶ 109 through 115 were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose, *inter alia*, that: (i) certain of the Company's contracts in its NEMT segment were causing ModivCare's free cash flow to deteriorate; (ii) as a result, the Company's contract renegotiations and pricing accommodations were negatively impacting the Company's adjusted EBITDA; (iii) as a result, the Company had insufficient liquidity; (iv) the Company failed to maintain adequate internal controls; and (v) as a result of the foregoing, the

Company's public statements regarding its business, operations, and prospects were materially

false and misleading and lacked a reasonable basis at all relevant times.

***The Truth Emerges***

117.     As detailed above, the truth began to emerge as early as May 4, 2023. The truth

continued to emerge on September 12, 2024, when the Company filed a Form 8-K with the SEC

and revealed that the Company was "undertaking actions to seek additional capital, including filing

a shelf registration statement" with the SEC to improve its liquidity due, in part, outstanding

contract receivables. The Form 8-K stated, in relevant part:

> In anticipation of ModivCare Inc.'s (the "Company" or "our") undertaking actions
> to seek additional capital, including filing a shelf registration statement with the
> Securities and Exchange Commission ("SEC"), this Current Report on Form 8-K is
> being filed solely to update our consolidated balance sheets as of December 31,
> 2023 and 2022, the related consolidated statements of operations, stockholders'
> equity, and cash flows for each of the years in the three-year period ended
> December 31, 2023, and the related notes, and financial statement schedule II
> (collectively, the "Consolidated Financial Statements"), to add Note 19 (Events
> Subsequent to the Date of the Issuance of the Financial Statements (Unaudited))
> thereto.
>
> As previously disclosed, the Company continues to pursue collection of
> outstanding contract receivables for services rendered. While a portion of these
> receivables has been collected, the Company has not offset the existing and
> continued accumulation of receivables during the period. Management believes it
> has made substantial progress in reaching oral and written assurances and
> agreements from its customers related to collecting these outstanding receivables.
> However, various factors beyond the Company's control have delayed and
> extended the timeline beyond original expectations. Although these collection and
> mitigation efforts continue, there remains the possibility that the Company will not
> achieve full resolution in a timely manner or at all if unforeseen circumstances
> arise.

118.     On this news, the Company's stock price declined $18.43 per share, or

approximately 59%, to close at $12.76 per share on September 12, 2024.

119.     Then, on September 16, 2024, the truth was fully revealed when the Company

issued a press release providing a financial update. In this press release, the Company revised its

2024 Adjusted EBITDA guidance range from $185–$195 million to $170–$180 million, "primarily due to NEMT segment pricing accommodations made to strategically retain and expand key customer relationships." Specifically, the press release stated:

> Modivcare Inc. (the "Company" or "Modivcare") (Nasdaq: MODV), a technology-enabled healthcare services company providing a platform of integrated supportive care solutions focused on improving health outcomes, today addressed its recent filings with the U.S. Securities and Exchange Commission ("SEC") and announced adjusted guidance.
>
> On September 12, 2024, the Company filed a Form S-3 shelf registration statement with the SEC, as well as a Form 8-K, providing additional information. Once declared effective by the SEC, the Form S-3 will provide the Company with flexibility to raise capital as needed over the next three years.
>
> The Company does not plan to issue equity at this time. The Company is focused on seeking near-term covenant relief under its revolving credit facility to address potential delays in contract receivable collections. Advanced discussions with the Company's bank group have been collaborative and supportive.
>
> **Contract Receivables**
>
> - Modivcare remains confident in collecting outstanding receivables from its managed care organizations ("MCOs") and state payor customers.
>
> - As previously disclosed, the Company has experienced delays in the timely collection of approximately $60 million of its outstanding $159.3 million in NEMT segment current contract receivables, primarily from MCO customers, as of June 30, 2024.
>
> - This situation is primarily driven by the impacts of Medicaid redeterminations and the resulting increase in utilization under its shared-risk contracts.
>
> - The Company expects to enter 2025 with aligned prepayment rates and does not anticipate the situation to persist as utilization patterns continue to stabilize.
>
> **Adjusted Guidance**
>
> The Company revised its 2024 Adjusted EBITDA guidance range from $185–$195 million to $170–$180 million, primarily due to NEMT segment pricing accommodations made to strategically retain and expand key customer relationships.

Additionally, the Company provided guidance for Adjusted EBITDA growth in excess of 10% in 2025, based on the updated 2024 guidance.

120.    On this news, the Company's stock price declined $1.40 per share, or approximately 10%, to close at $12.72 per share on September 16, 2024.

***Stock Repurchases During the Relevant Period***

121.    According to the Company's public filings, while the price of Company stock was artificially inflated due to the false and misleading statements detailed herein, the Individual Defendants caused the Company to repurchase approximately 10,529 shares of its own stock, for a total of roughly $967,691.

122.    According to the Company's public filings, ModivCare made the following repurchases of its own stock during the Relevant Period:

| Dates of Stock Repurchase | Number of Shares Repurchased | Average Price Per Share on Date of Repurchase | Total Cost of Repurchase |
|---|---|---|---|
| November 1, 2022 to November 30, 2022 | 1,323 | $91.17 | $120,617.91 |
| December 1, 2022 to December 31, 2022 | 68 | $90.10 | $6,126.80 |
| February 1, 2023 to February 8, 2023 | 4,896 | $107.66 | $527,103.36 |
| March 1, 2023 to March 30, 2023 | 1,104 | $84.93 | $93,762.72 |
| April 1, 2023 to April 30, 2023 | 3,028 | $70.94 | $214,806.32 |
| June 1, 2023 to June 30, 2023 | 110 | $47.95 | $5,274.50 |

123.    Given that the price of ModivCare stock was $12.72 per share after the corrective disclosures on September 16, 2024, the true value of the 10,539 repurchased shares was roughly $133,928. Accordingly, the Individual Defendants caused the Company to overpay by approximately $833,763 to repurchase these shares.

*Harm to the Company*

124.    As a direct and proximate result of the Individual Defendants' misconduct, ModivCare has lost and expended, and will lose and expend, millions of dollars.

125.    Such expenditures include, but are not limited to, the legal fees associated with the Securities Class Action filed against the Company and Defendants Sampson, Shepard, and Gutierrez, and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

126.    Such expenditures also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, as well as the hundreds of thousands of dollars the Individual Defendants caused the Company to spend in repurchasing its stock at artificially inflated prices during the Relevant Period.

127.    Furthermore, the Securities Class Action has exposed the Company to massive class-wide liability.

## <u>DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS</u>

128.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other violations of law.

129.    ModivCare is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

130.    Plaintiff is a current shareholder of ModivCare stock and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

131.    A pre-suit demand on the Board of ModivCare is futile, and therefore, excused. At the time this action was commenced, the seven-member Board was comprised of Defendants Norwalk, Carter, and Sampson (the "Director Defendants"), and non-parties Alec Cunningham, David Mounts Gonzales, Erin L. Russell, and David B. Silvers (collectively with the Director Defendants, the "Directors"). Accordingly, Plaintiff is only required to show that four directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, at least four of the Board's current directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

132.    The Director Defendants either knew, or should have known, of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

133.    Additionally, each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

134.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

135.    Defendant Sampson is not disinterested or independent and is therefore incapable

of considering a demand. Defendant Sampson has served as the Company's President and CEO since November 2022 and served as CFO of the Company from February 2021 until September 2023. Thus, the Company admits that Defendant Sampson is a non-independent director. Furthermore, Defendant Sampson is not disinterested or independent because he is named as a defendant, and faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

136.    Moreover, the 2022 10-K and 2023 10-K were signed by Defendants Sampson, Carter, and Norwalk. Accordingly, Defendants Sampson, Carter, and Norwalk breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus, demand upon them is futile, and therefore, excused.

137.    Furthermore, Defendants Sampson, Carter, and Norwalk each solicited the 2023 Proxy, which led to the reelection of Defendants Samant and Sampson to the Board, allowing them to continue breaching their fiduciary duties to the Company. Defendants Sampson, Carter, and Norwalk also each solicited the 2024 Proxy, which led to the reelection of Defendants Carter, Coulter, Graham, Norwalk, Samant, and Sampson to the Board, allowing him to continue breaching their fiduciary duties to the Company.

138.    Defendant Norwalk served as a member of the Audit Committee during the Relevant Period and, pursuant to the Audit Committee Charter, was specifically charged with the responsibility of assisting the Board in fulfilling its oversight responsibilities related to internal controls over financial reporting and public disclosure requirements. Throughout the Relevant Period, however, Defendant Norwalk breached her fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions

regarding material deficiencies in the Company's accounting practices and the adequacy of the Company's internal controls as alleged above. Therefore, Defendant Norwalk cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

139.    Additionally, each of the directors received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company. Indeed, all of the Individual Defendants benefitted directly from the wrongdoing alleged herein. Specifically, the Individual Defendants benefitted from the artificial inflation of the price of the Company's stock and the resulting increase in the value of ModivCare stock and stock options they held.

140.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures over financial reporting and failed to make a good faith effort to correct the problems or prevent their recurrence. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

141.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to ModivCare's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly engaged in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood

of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

142. Furthermore, demand in this case is excused because each of the Directors derive substantial revenue from the Company, control the company, and are indebted to each other. For instance, Defendants Norwalk and Graham, and Director Alec Cunningham ("Cunningham") each have served in various roles at CVS Health Corporation ("CVS") or its subsidiary companies, including Aetna. Defendant Norwalk currently serves as a member of the board of directors of CVS. Director Cunningham previously served as Executive Vice President of CVS from February 2021 until July 2022 and as the Executive Vice President and Chief Operating Officer at Aetna from August 2019 until February 2021. Defendant Graham served as Chief Community Health Officer at CVS from 2018 until 2020 and as President of the Aetna Foundation from 2013 until 2019, as well as Vice President of Community Health at Aetna, Inc. from 2017 until 2018. Additionally, Defendants Shackelton and Sampson have each served in roles at Advanced Emissions Solutions, Inc., with Sampson serving as CEO from 2015 until 2020 and Shackleton serving on the board of the company from 2014 through 2016.

143. These conflicts of interest have precluded the current directors from adequately monitoring the Company's operations and internal controls and calling into question the other Individual Defendants' conduct. Significantly, none of the Board's current members have taken remedial action to redress the conduct alleged herein. For instance, none of the Company's current directors have sought to enforce the Company's Clawback Policy, which allows the Company's Compensation Committee to "make retroactive adjustments to any excess cash or equity-based incentive compensation paid to executive officers and certain other officers where the payment was predicated upon the achievement of certain financial results that were subsequently the subject of a restatement."

144.    The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

145.    The acts complained of herein constitute violations of fiduciary duties owed by ModivCare's officers and directors, and these acts are incapable of ratification.

146.    Accordingly, for all of the reasons set forth above, at least four of the Company's current Directors cannot consider a demand with disinterestedness and independence. Consequently, a pre-suit demand on the Board is futile and excused.

## COUNT I

**Against the Individual Defendants for Violations of § 14(a)**
**of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R. § 240.14a-9)**

147.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

148.    The Individual Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

149.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that "[i]t shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the

protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

150.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9.

151.    The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of the materially false and misleading statements in the 2023 Proxy and 2024 Proxy (collectively, the "Proxy Statements"), which were each filed with the SEC. As alleged above, the Proxy Statements contained materially false and misleading statements concerning the adequacy of the Company's risk management function and its internal controls over financial reporting.

152.    The misrepresentations and omissions in the Proxy Statements were material to Company stockholders. Specifically, the misrepresentations and omissions were material to Company stockholders in voting on matters set forth for shareholder determination in the Proxy Statements, including, but not limited to, the reelection of certain Director Defendants.

153.    The 2023 Proxy was used to solicit shareholder votes in connection with the reelection of Defendants Sampson and Samant to the Company's Board, among other things. The materially false and misleading statements contained in the 2023 Proxy regarding the adequacy of the Company's risk management function and its internal controls over financial reporting therefore misleadingly induced shareholders to vote in favor of the reelection of Defendants

Sampson and Samant to the Board.

154.    The 2024 Proxy was used to solicit shareholder votes in connection with the reelection of Defendants Carter, Coulter, Graham, Norwalk, Samant, and Sampson to the Company's Board, among other things. The materially false and misleading statements contained in the 2024 Proxy regarding the adequacy of the Company's risk management function and its internal controls over financial reporting therefore misleadingly induced shareholders to vote in favor of the reelection of Carter, Coulter, Graham, Norwalk, Samant, and Sampson to the Board.

155.    As a result of the Individual Defendants material misrepresentations and omissions in the Proxy Statements, the Company has sustained significant damages.

156.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

### COUNT II

**Against the Individual Defendants for Violations of § 10(b)
of the Exchange Act, 15 U.S.C. § 78(j), and Rule 10b-5, 17 C.F.R. § 240.10b-5**

157.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

158.    The Individual Defendants participated in a scheme with the purpose and effect of defrauding ModivCare. Not only is ModivCare now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon ModivCare by the Individual Defendants.

159.    During the Relevant Period, while the Company's stock price was artificially inflated as a result of the false and misleading statements issued, the Individual Defendants caused the Company to overpay by approximately $833,763 to repurchase roughly 10,529 shares of its own stock.

160.    The Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

161.    The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about ModivCare not misleading.

162.    The Individual Defendants, as directors and officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to, and did, control the conduct complained of herein and the content of the public statements disseminated by ModivCare.

163.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

164.    The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have caused the Company to expend over

$967,691 in the repurchase of Modivcare stock at artificially inflated prices and have exposed the Company to millions of dollars in potential class-wide damages in the Securities Class Action.

165.    By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

166.    Plaintiff, on behalf of ModivCare, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants
### For Violations of Section 20(a) of the Exchange Act

167.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

168.    The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions of control within the Company, the Individual Defendants had the authority to cause the Company to issue materially false and misleading statements, and to repurchase ModivCare stock at prices artificially inflated by those materially false and misleading statements.

169.    Plaintiff, on behalf of ModivCare, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for
### Breach of Fiduciary Duties

170.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

171.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

172.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

173.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by failing to implement and monitor adequate internal controls over the Company's financial reporting and, as a consequence, issuing or permitting the issuance of materially false and misleading statements in the Company's SEC filings and other public disclosures. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

174.    Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia,* that: (i) certain of the Company's contracts in its NEMT segment were causing ModivCare's free cash flow to deteriorate; (ii) as a result, the Company's contract renegotiations and pricing accommodations were negatively impacting the Company's adjusted EBITDA; (iii) as a result, the Company had insufficient liquidity; (iv) the Company failed to maintain adequate internal controls and risk oversight over its financial reporting; and (v) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

175.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

176.    Additionally, the Individual Defendants willfully or recklessly caused the Company to repurchase over ten thousand shares of its own common stock at artificially inflated prices

during the Relevant Period.

177.    As a result of the misconduct alleged herein, the Individual Defendants are liable
to the Company. As a direct and proximate result of the Individual Defendants' breach of their
fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate
image and goodwill. Such damage includes, among other things, costs incurred in defending itself
in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide
damages in the Securities Class Action, and damage to the share price of the Company's stock,
resulting in an increased cost of capital, and reputational harm.

178.    Plaintiff, on behalf of ModivCare, has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Aiding and
### Abetting Breach of Fiduciary Duty

179.    Plaintiff incorporates by reference and realleges each and every allegation
contained above, as though fully set forth herein.

180.    By encouraging and accomplishing the illegal and improper actions alleged herein
and concealing them from the public, the Individual Defendants have each encouraged, facilitated,
and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have
each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties,
waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained
of herein.

181.    As a result of the misconduct and breaches of duty alleged herein, the Individual
Defendants are liable to the Company.

182.    Plaintiff, on behalf of ModivCare, has no adequate remedy at law.

## COUNT VI

**Against the Individual Defendants for
Unjust Enrichment**

183.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

184.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of and to the detriment of ModivCare.

185.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from ModivCare that were tied to the performance or artificially inflated valuation of ModivCare, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

186.    Plaintiff, as a stockholder and representative of the Company, seeks restitution from the Individual Defendants, and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants as a result of their wrongful conduct and fiduciary breaches.

187.    As a direct and proximate result of the Individual Defendants' misconduct, the Company has suffered significant damages, as alleged herein.

188.    Plaintiff, on behalf of ModivCare, has no adequate remedy at law.

## COUNT VII

**Against the Individual Defendants
for Waste of Corporate Assets**

189.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

190.    The wrongful conduct alleged regarding the issuance of false and misleading

statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

191.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; (ii) causing the Company to repurchase millions of shares of its own common stock at artificially inflated prices; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Class Action.

192.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

193.    Plaintiff on behalf ModivCare has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Awarding punitive damages;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: May 12, 2025

**OF COUNSEL:**

**RIGRODSKY LAW, P.A.**
Vincent A. Licata
Leah B. Wihtelin
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683.3516
Facsimile: (302) 654-7530
Email: vl@rl-legal.com
Email: lw@rl-legal.com

**GRABAR LAW OFFICES**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Tel:  267-507-6085
Email: jgrabar@grabarlaw.com

**RIGRODSKY LAW, P.A.**

By: */s/ Gina M. Serra*
Gina M. Serra
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Facsimile: (302) 654-7530
Email: gms@rl-legal.com

*Attorneys for Plaintiff*